## Case No. 17,188.

### WARNER et al. v. RISING FAWN IRON CO.

[3 Woods, 514.] [1]

Circuit Court, N. D. Georgia. March, 1878.

APPOINTMENT OF RECEIVERS — FORECLOSURE OF MORTGAGE — PLEDGE OF BONDS PAYABLE TO BEARER—DEMAND OF PAYMENT.

1. A mortgage to secure an issue of bonds provided that, after a default continuing for six months, in the payment of the interest coupons attached to the bonds, the trustees named in the mortgage might, upon the request of any holder of bonds. take possession of the mortgaged property and advertise and sell the same to pay the bonds and coupons. A bill having been filed to foreclose the mortgage, *held*, that the fact that the condition existed which authorized the trustees to take possession of the mortgaged property, and the refusal of the trustees to take possession, were sufficient grounds for the appointment of a receiver.

[Cited in Dow v. Memphis & L. R. Co., 20 Fed. 264.]

2. Pledgees of bonds payable to bearer, hypothecated to secure a debt, are legal holders, and are entitled to demand payment of coupons which fall due before the maturity of the debt which the bonds were pledged to secure.

3. Generally suit may be brought on any commercial paper payable at a particular place without a previous demand at that place.

4. Bonds, payable to bearer, issued by an incorporated company, contained the following provision in relation to the payment of interest, viz.: "With interest at the rate of ten per cent per annum, payable semi-annually on the first days of January and July in each year, on the presentation of the respective coupons hereto attached, both principal and interest payable at the principal office of said company in the city of New York." *Held*, that under this form of bond the coupons might be sued without previous presentation for payment.

In equity. Heard upon motion to continue receiver and injunction.

During the vacation of the circuit court, to wit, on January 26, 1878, Judge Erskine, the district judge, on the application of complainants [James C. Warner and others], and after due notice to defendants and argument of counsel, directed an injunction to issue restraining the defendants, their agents and attorneys, from interfering with or controlling the property described in the deed of trust, to foreclose which the suit was brought. He also appointed a receiver to take possession of the trust property and preserve and manage the same under the direction of the court. During the regular term of court following, beginning on the second Monday of March, the complainants moved that the injunction allowed by the district judge. and his order appointing a receiver, be continued. This motion, which was strenuously resisted by the defendants, was, by consent of parties, continued until June, 1878, and the motion was then heard and argued upon the showing made on the original hearing and upon additional affidavits introduced by both parties.

The bill was filed by complainants as holders of first mortgage bonds to the amount of $88,-000, issued by the defendant, the Rising Fawn Iron Company, and secured by a first mortgage upon all its property, situated in Dade county, Georgia, consisting of lands, a blast furnace erected thereon, and all the property, whether real or personal, used by the company in Dade county. Georgia, in the manufacture of iron and in carrying on that business. The bonds were issued and the trust deed to secure them executed by authority of an act of the legislature of Georgia, approved February 2, 1876, entitled "An act to amend the charter of

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

the Rising Fawn Iron Company," etc. (Laws Ga. 1876, p. 248). This act authorized the company, on a vote of a majority of the stock, to execute its first mortgage bonds for any sum not exceeding $125,000, one hundred of said bonds to be for the sum of $1,000 each, and fifty for the sum of $500 each; all to fall due in five years, and bear a rate of interest not exceeding ten per cent per annum, "payable semi-annually on the first days of January and July, for which interest coupons shall be attached to said bonds specifying the amount of interest due on each and the date of its payment." The act further authorized the company to execute a deed of trust on all its property, real and personal, in Dade county, Georgia, used in carrying on its business and in manufacturing pig iron, to secure the principal and interests of said bonds, and the act declared, "in case the coupons due on said first mortgage bonds shall at any time remain unpaid for the space of six months, the principal of said first mortgage bonds shall then become due on account of the failure to pay said coupons, and it shall be the duty of the trustees mentioned in said trust-deed, within sixty days after said default, to pay the interest due as aforesaid," to advertise and sell the property conveyed by said deed of trust, and to convey the same to the purchaser and to apply the proceeds to the payment first of said first mortgage bonds and coupons. The act further provided that when said deed of trust was recorded in the proper office, the bonds and coupons secured thereby should be "the first lien prior and superior to all others on all the property included in said trust deed." The trust deed was drafted in substantial conformity with the statute. The bonds declared that they were "payable on the first day of March, 1881, with interest at the rate of ten per cent per annum, payable semi-annually on the first days of January and July in each year, on presentation of the respective coupons hereto attached, both principal and interest being payable at the financial office of said company in the city of New York." The bonds further declared: "Should the coupons due on said first mortgage bonds remain unpaid after becoming due for the space of six months, the principal of said first mortgage bonds shall then become due." The deed of trust also declared: "And in case said party of the first part shall, for the space of six months, make default in the payment of the semi-annual interest to become due upon said mortgage bonds, then after the expiration of said six months from the time it becomes due, the whole principal sum mentioned in each and all of said mortgage bonds, then outstanding, shall then forthwith become due and payable, and the lien or incumbrance hereby created for the security and payment thereof, may at once be enforced as hereinafter provided. And it is agreed, in case of the default of the payment of the semi-annual interest for six months, as above provided, that said trustees or their successors are hereby expressly authorized and empowered, upon the request of

the owners or holders of said bonds, or any of them, to enter into and upon and take actual possession of all the property, real and personal, hereby conveyed, and each and every part thereof, within sixty days after said default of six months to pay said interest coupons, and to advertise and sell said property," etc., and make a deed therefor to the purchaser. The deed of trust further declared as follows: "The conveyance hereby effected is subject to the possession and management of said property by said party of the first part (the Rising Fawn Iron Company), its successors and assigns, so long as no default shall be made in the payment of the principal or interest of said bonds or either of them, and so long as said party of the first part shall well and truly keep, observe and perform all the covenants, agreements, conditions and stipulations of said bonds," etc. The company issued one hundred bonds of $1,000 each, and fifty bonds of $500 each, all secured by the deed of trust. The complainants claimed to be the holders of $88,000 of said first mortgage bonds; that of the bonds for $1,000 each they held those numbered from one to fifty-two, both numbers inclusive; number fifty-six; numbers from sixty-three to sixty-seven, both inclusive; numbers from seventy-two to seventy-eight, both inclusive; number eighty-three; and numbers ninety-five, ninety-six and ninety-seven; and of the bonds of the denomination of $500 they held all numbered from one to thirty, both inclusive, except numbers five, six, twelve and twenty-nine. Complainants claimed that the coupons attached to the bonds for one thousand dollars each, numbered from thirty-one to thirty-eight, both inclusive, held by them and due July 1, 1876, were not paid and were still due and unpaid, and that the coupons due on said bonds on the first days of January and July had not been paid, and that none of the coupons falling due July 1, 1877, on the bonds held by complainants, had been paid.

It was made to appear by the evidence submitted that on the 31st day of August, 1876, the Rising Fawn Iron Company ceased to carry on business, and that all its officers left the state of Georgia, where its property was situate. The property was, however, left in charge of T. J. Lumpkin, an attorney-at-law, as agent for the company. On September 9, 1876, all the personal property of the company was sold to one Hale on execution at sheriff's sale for the benefit of judgment creditors, and on December 21, 1876, the personal and real property of the company was sold on execution to J. W. Cureton, and that he took possession of both the real and personal property. In March, 1877, a convention of the creditors of the company who were not holders of first mortgage bonds, leased the furnace and other property to one W. C. Peters, who went into possession and kept the furnace in operation from April, 1877, to July 26 of the same year, when Cureton again took possession of said property. He carried on said furnace for a short time after he resumed possession, but soon blew out and

quit work for want, as he stated, of a supply of fuel, and the furnace had not again been put in blast until after the filing of the bill in this case.

It was charged in the bill, and not denied, that the property covered by the deed of trust consisted of several thousand acres of land, on which a blast furnace had been erected, with all the machinery, tools and appliances necessary to carry on the business of manufacturing pig iron. There was also on said land about five miles of railway and two locomotive engines and several cars, a large pair of scales, tools of various kinds, movable engines, and other valuable property not attached to the realty. After the sales above referred to, a large part of said movable property was carried away from the premises and state, or used up and worn out. At the time of the filing of the bill many persons were living on the land who paid no rent and cut timber and did other acts of waste, and some of the land had been sold for taxes. While the property was in the possession of Peters it was greatly damaged and materially deteriorated in value. When the furnace was blown out by Cureton, soon after the tenancy of Peters ceased, it was partially filled with a mass of cinders, iron, limestone and other matter which had chilled and solidified, and could only be removed by drilling and blasting. For some time before this bill was filed, Cureton had been engaged in removing this mass from the furnace and in putting it generally in order, and after the bill was filed he put the furnace in blast, and the weight of the evidence was that when the receiver in this case was appointed, the furnace was in good repair, and, under the management of Cureton, was doing well.

The complainants claimed that they were the holders and owners, among others, of eight bonds of $1,000 each, numbered from thirty-one to thirty-eight, inclusive, dated March 6, 1876, on which the interest coupons, due July 1, 1876, for $31.94 each, were and still remained unpaid, as well as the interest coupons due January 1, 1877, for $50 each. The facts with regard to the issue of these and other bonds held by the complainants were, as appeared from the evidence, as follows: Some time before July 1, 1876, when the first coupons fell due, the Rising Fawn Iron Company had hypothecated said bonds, with all the coupons attached to secure certain debts, evidenced by notes, which the company owed. These notes were not due at the time of the hypothecation, nor did they fall due until some time after July 1, 1876. The parties for whose benefit these bonds were hypothecated had no right, under the contract of hypothecation, to sell the bonds until after the notes they were given to secure became due, and the bonds were not in fact sold by the pledgees until after that time. J. S. Haselton testified that about June 15, 1877, he contracted to sell to Morrow, one of the complainants, first mortgage bonds of the company to the amount of forty thousand dollars, and in a few days afterwards the contract was completed by

the delivery of the bonds to Morrow and the payment therefor by him, and among the bonds so delivered were eight to which all the coupons were attached. At the time of the contract between Morrow and Haselton the bonds, afterwards delivered to Morrow, were hypothecated or held by creditors of the Rising Fawn Iron Company, and this fact was then known to Morrow. After the date of said contract, said bonds so held as collateral were sold by the pledgees and purchased by Haselton, so that he might be able to perform his contract with Morrow. There was no presentation for payment on July 1, 1876, of the coupons on the eight bonds held by complainants, nor was it shown or claimed that there were funds provided at the place where said coupons were payable to pay the same on that day. It appeared by a supplemental bill that none of the coupons on any of the bonds due January 1, 1878, and July 1, 1878, had been paid, although on July 1, 1878, the coupons held by complainants were presented and payment demanded. The complainants claiming that default had been made in the payment of the interest coupons due July 1, 1876, on the said eight bonds heretofore particularly mentioned, and on coupons attached to other bonds held by them, served notice on the trustees named in the deed of trust, of such default, and required them to take possession of said trust property in accordance with the terms of the trust-deed, and to proceed to advertise and sell the same, and to apply the proceeds to the payment of the sums due on the first mortgage bonds. With this demand the trustees refused to comply, and thereupon complainants filed this bill to enforce, for their benefit and the benefit of all other holders of first mortgage bonds, the trusts in said deed of trust contained.

J. L. Hopkins and J. T. Glenn, for complainants.

H. K. McCay and R. P. Trippe, for defendants.

WOODS, Circuit Judge. The question to be determined is, whether, on the facts shown by the pleadings and evidence, the court ought to discontinue the injunction and to discharge the receiver and restore the possession of the trust property to Cureton, the alleged purchaser at sheriff's sale. No objection is made to the receiver appointed by the court or to his management of the property—which his reports show to be reasonably successful and profitable. In my judgment, the facts abundantly justified the appointment of a receiver in the first instance, as the case was then presented to the district judge. If there was a default in the payment of interest coupons for the period of six months after they fell due, the trustees named in the deed of trust were authorized, upon the request of the holder or holders of any of the bonds, to enter upon and take actual possession of the trust property, and to advertise and sell the same. And by the express stipulation of the trust-deed, the Rising Fawn Iron Company reserved the right to the possession

and management of the trust property only so long as no default should be made in the payment of either interest or principal of the bonds. Cureton, by his purchase at sheriff's sale on a subsequent incumbrance, could not place himself in a stronger position than the company itself. Suppose there had been no sheriff's sale, and the company had remained in possession of the trust property, could it have lawfully resisted the right of the trustees to demand and take possession of the trust property after six months' default in the payment of the principal or interest of the bonds? The right to the possession after such default is as clearly conferred by the trust-deed as the right to payment of the principal and interest on the bonds. If the company could not resist the demand of the trustees to take possession of the trust property after default, neither could it claim that this court could not rightfully take possession on a bill filed by the bondholders to enforce their rights under the trust-deed. If the contingency existed when it was the right and duty of the trustees, in the execution of their trust, to take possession of the trust property, it was incumbent on the court, upon failure of the trustees to discharge that duty, to compel them to act or to appoint some one to act in their stead. Independent, therefore, of any jeopardy to the trust property, the company lost, and the trustees acquired, the right to the possession of the trust property, after six months' default in the payment of the interest coupons. But the evidence is satisfactory to the point that there had been, at the time of the filing of the bill, serious loss and depreciation of the trust property.

The question on which the motion turns is, has there been any default on the part of the Rising Fawn Iron Company, in the payment of the interest coupons attached to the first mortgage bonds held by complainants? The complainants assert that there has, and the defendants, the Rising Fawn Iron Company and Cureton, assert that there has not. There is no dispute that the interest coupons, due July 1, 1876, on the eight bonds heretofore specified, held by the complainants, were not paid on that day, and have not since been paid. The reply of the defendants to this fact is: First. That there was nothing payable on the coupons falling due July 1, 1876, because the bonds to which they were attached were deposited before July 1, 1876, as collateral security for debts which did not mature until after that date. This ground appears to me to be clearly untenable. By depositing the bonds as collateral security, with all the coupons attached, the company made the pledgee the legal holder, subject only to the rights of the company, on payment of the debt for which they were held as security. If the pledgee had transferred the bonds to an innocent purchaser, such transfer would have carried with it the legal title. In Georgia, by express enactment, the holder of a note, as collateral security for a debt, stands upon the same footing as a purchaser.

Code Ga. § 2788. See, also, Goodman v. Simonds, 20 How. [61 U. S.] 343; 1 Daniel, Neg. Inst. §§ 820–822, 824, 825. When, therefore, the bonds were pledged as collateral security, the pledgee became the legal holder, and he became the holder of all the coupons attached and not due, as well as of the bond itself. The bonds and the coupons were all pledged for the payment of the debt which was secured by the deposit of the bonds and coupons. The fact that the debt secured was not due did not relieve the coupons, any more than the bond itself, from the effect of this hypothecation. To hold otherwise would be to hold that if the bonds themselves fell due before the debt secured by the pledge of the bonds, their hypothecation was without any effect whatever. 1 Daniel, Neg. Inst. §§ 825, 826. This is true, where the pledge is made to secure a pre-existing debt. In this case it does not appear that the bonds were transferred to secure a debt already existing. The presumption is, that the creation of the debt and the giving of the security were contemporaneous.

It is clear to my mind that the pledgees of the bonds deposited as collateral security, before July 1, 1876, were legal holders, and had the right to demand and receive the interest due July 1, 1876. This right was a part of their security. Upon the failure to pay the coupons, the pledgee had all the rights of any other legal holder or purchaser of the bonds. And a default, for six months, in the payment of such interest, gave the pledgee the same right as any other purchaser to insist that the principal of the bond had become due in accordance with its terms and the terms of the trust-deed. In short, the collateral holder took the bonds and coupons with all their terms and stipulations, unaffected by the fact that they were held as security for another debt, and that that debt was not due. He had the right to collect the interest on the bond as it fell due, and to enforce payment of the principal in accordance with the terms of the bond. He only differed from an absolute owner in this, that he was bound to account for any surplus received from the bonds and coupons, over and above what was necessary to the payment of his debt. When the pledgee transferred the bonds to the complainants, they acquired all his rights. The fact, therefore, that the complainants knew before they purchased the bonds, that they were in pledge, has no effect, for the complainants are claiming no rights which the parties from whom they purchased the bonds did not have.

It is insisted that because the pledgee did not know that he was entitled to collect the interest coupons which fell due before the maturity of the debt secured by the pledge of the bonds, therefore he had no such right. But men's rights are not lost by the fact that they are ignorant of them, much less can such ignorance destroy the rights of the subsequent holder of the bonds. In my judg-

ment, the collateral holder of the bonds, on July 1, 1876, had the right to demand payment of the coupons due on that day, and on a default of payment continuing six months, had the right to demand as due, by reason of such default, both the principal and interest on his bonds, and that when he transferred his bonds and coupons, for value, to a purchaser, the transfer carried with it all the rights of the original collateral holder.

But it is claimed, second, by defendants, that there was no default in the failure to pay the coupons due July 1, 1876, because there was no presentation of the coupons for payment. Generally, a suit may be brought on any commercial paper, payable at a particular place, without demand at that place. Wallace v. McConnell, 13 Pet. [38 U. S.] 136; Montgomery v. Elliott, 6 Ala. 701. The peculiar form of the bond, in this case, it is insisted, takes it out of this general rule. The bond promises to pay the principal and "interest at the rate of ten per cent per annum, payable semi-annually on the first days of January and July in each year, on presentation of the respective coupons hereto attached, both principal and interest being payable at the financial office of said company, in the city of New York." Neither the act authorizing the company to issue bonds, nor the mortgage nor the coupons themselves, say anything about the presentation of the coupons as a condition of payment. Does the form of the bond require presentation of the coupon and demand of payment before the company can be put in default? It seems to me that it does not. If a cause of action accrues on a coupon in which the words "on presentation" do not occur, as soon as it falls due and is unpaid, without any demand, I do not think the insertion, in the trust-deed, of the words "on presentation of this coupon," changes the rule. The evident purpose is to indicate that the interest is to be paid on the coupon, without the production of the bond. The words do not change the legal effect of the coupon, for the company is not bound to pay unless the coupon is not only presented but delivered up: Wolcott v. Van Santvoord, 17 Johns. 248; 2 Daniel, Neg. Inst. § 1508. But it is said that if this construction is correct any coupon holder could, by failure to present his coupon for payment when due, cause both the principal and interest on all the bonds to become payable long before the date named for their maturity. No such result would follow if the company could truly aver that it had funds at the place designated for the payment sufficient to pay the coupons if they had been presented. This would be a conclusive answer to the claim that the principal of the bonds had become due, by reason of default in the payment of interest.

It is averred in the bill that no funds were provided for the payment of these coupons on the eight specified bonds which fell due July 1, 1876. This is not denied in any answer or affidavit filed in this case, though it was clearly within the power of the company to prove the fact that it had provided for the payment of these coupons at maturity, if such had been the case, for it is not pretended or claimed that funds were ready for the payment of these coupons, if they had been presented. The defense relied on is the failure to present the coupons for payment at a place, where there was no money provided to pay them. The coupons attached to the eight bonds were due July 1, 1876. They were not paid on that day, nor was any money provided for their payment. No payment was made, nor offered to be made, within six months after the maturity of the coupons. By the terms of the bond and trust-deed, both the principal and interest of the bonds became due. No offer has been made to pay the principal and interest. The company itself has never provided any funds to pay interest, and the interest due January 1 and July 1, 1878, has never been paid by any one. The evidence is overwhelming, that in a commercial sense the company is insolvent. It appears to me, from the facts of the case, that its property, if brought to sale, would not pay the first mortgage bonds and interest. There appears, therefore, no reason why the order of the district judge, in vacation, appointing a receiver, should be revoked. On the contrary, if the case were presented here for the first time, we should feel bound to accede to the prayer of the bill, and allow the injunction and appoint a receiver, as has already been done.

It was suggested in the argument, that the sale of the bonds of the company, which had been pledged as collateral security for the company's own debt, at a price below par, amounted to usury, and the bonds and coupons were, therefore, void. As this is nowhere set up in any of the answers filed in the case, it is not necessary or proper now to discuss or decide it. It was also claimed, in argument, that some of the judgments on which the Rising Fawn Iron Company's property was sold were founded on mechanics' liens, and that they were superior to the lien of the first mortgage bonds, under the constitution of Georgia. This, also, is matter of defense not set up in any of the answers. On the contrary, the answers of the company admit that the first mortgage bonds were the first and highest lien on the property covered by the trust-deed. It is, therefore, unnecessary at this time, to discuss this question.

The motion to continue the receiver and injunction must prevail.